UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
_____
                              )
JAMES J. KAUFMAN,             )
                              )
         Plaintiff,           )
                              )
    v.                        )   Civil Action No. 05-1631 (RWR)
                              )
ERIC HOLDER et al.,           )
                              )
         Defendants.          )
_____)
```

## MEMORANDUM OPINION

The adversaries in this case have each moved for summary judgment with respect to the only issue still in dispute. The plaintiff's motion for summary judgment will be granted in part, the defendants' motion for summary judgment will be denied, and the matter will be remanded to the Director of the United States Citizenship and Immigration Services ("USCIS") for action consistent with this memorandum opinion.

BACKGROUND

The plaintiff, James Jonathan Kaufman, is a United States citizen by virtue of his birth. In July 2004, Kaufman attempted to renounce his United States citizenship under a statute that provides

> (a) A person who is a national of the United States whether by birth or naturalization, shall lose his nationality by voluntarily performing any of the following acts with the intention of relinquishing United States nationality —
>
> (6) making in the United States a formal written renunciation of nationality in such form as may be prescribed by, and before such officer as may be designated by, the Attorney General, whenever the United States shall be in a state of war and the Attorney General shall approve such renunciation as not contrary to the interests of national defense[.]

8 U.S.C. § 1481(a)(6) (2006).[1]  Kaufman's various requests to renounce his citizenship under this provision, which had not been altered since it was adopted in 1944, met with either no response at all or a denial of responsibility for administering the provision.  Kaufman then filed suit against the Attorney General, the Secretary of the Department of Homeland Security and the Secretary of State, seeking among other things, a declaration of his rights and an order compelling some agency official to take action on his § 1481(a)(6) request.  *See* Compl. ¶¶ 20-40.  The complaint was first dismissed for lack of jurisdiction, a decision the court of appeals reversed.  *Kaufman v. Gonzales,* Civil Action No. 05-1631, 2006 WL 1725579, *1, 4-6 (D.D.C. June 20, 2006), *rev'd and remanded*, *Kaufman v. Mukasey,* 524 F.3d 1334 (D.C. Cir. 2008).

The court of appeals remanded the case for the determination of two issues:  (1) which government official has the responsibility to administer § 1481(a)(6); and (2) whether the official response to Kaufman was legally permissible.  *Kaufman v. Mukasey,* 524 F.3d at 1339.  After remand, the defendants took the position that the Director of USCIS is responsible for

---

[1] First adopted in 1944 while the United States was involved in World War II — a war that involved United States forces in armed combat against forces of nations against whom Congress had declared war (Japan, Germany, and Italy in 1941; Hungary, Romania, and Bulgaria in 1942) and had not declared war (Vichy France, fighting in North Africa in 1942), *see* Richard F. Grimmett, *Instances of Use of United States Armed Forces Abroad, 1798-2006,* at 15 (Cong. Res. Serv., Report for Congress, *avail. at* http://www.au.af.mil/au/awc/awcgate/crs/rl30172.pdf); Wikipedia, *Operation Torch,* http://en.wikipedia.org/wiki/Operation_Torch (describing the resistance of the Vichy French forces to the Allied invasion of Morocco, Algeria, and Tunisia, which involved more than 50,000 U.S. troops) (last visited Feb. 24, 2010) — the statute was designed as a "'means of accomplishing the detention of [American-born persons of Japanese ancestry] without violating the Constitution.'"  *Abo v. Clark,* 77 F. Supp. 806, 810 (N.D. Cal. 1948) (quoting affidavit of John L. Burling, assistant to the Director of the Alien Enemy Control Unit of the War Division of the Department of Justice, who had "first hand knowledge" of the renunciation provision and its application); *see also* 90 Cong. Rec. 1778 (Feb. 16, 1944) ("The purpose of the bill is to permit certain citizens of the United States to renounce their American citizenship and to permit such renunciation while the person is within the United States."); *id.* at 1785 ("[T]he bill before us is brought here primarily to affect the Japanese; nevertheless, it is all inclusive and does affect all citizens").

-3-

administering § 1481(a)(6), a position that Kaufman has ceased to dispute. *See* Pl.'s Mem. in Supp. of Mot. for Summ. J. at 17 (stating that the "outcome of this jurisdictional issue is not really relevant to this action, . . . as Kaufman does not care which agency actually issues the paperwork"). Also after the remand, Kaufman renewed his renunciation request by letter addressed to the Director. *See* Defs.' Mot. for Summ. J., Ex. 1 (Letter from Kaufman to Director, USCIS, Sept. 10, 2008). Kaufman's request to the Director was denied. The letter in response stated that § 1481(a)(6) "is not available as a vehicle for renunciation of United States citizenship because the United States is not currently in a 'state of war' as that term is used in the [statute]. For purposes of [§ 1481(a)(6)], the term 'state of war' means a congressionally declared state of war." Defs.' Status Report and Proposed Briefing Schedule, Ex. 1 (Letter from Donald Neufeld, Acting Associate Director for Domestic Operations, USCIS, Department of Homeland Security to Kaufman, Jan. 27, 2009) ("USCIS Letter") at 1. The agency's response to Kaufman went on to state that neither the law Congress passed in 2001, authorizing the President "to use all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001, or harbored such organizations or persons, in order to prevent any future acts of international terrorism against the United States by such nations, organizations or persons," Authorization for Use of Military Force, Pub. L. 107-40, § 2, 115 Stat. 224 (Sept. 18, 2001) ("AUMF"), nor the law Congress passed in 2002, authorizing the President "to use the Armed Forces of the United States as he determines to be necessary and appropriate in order to (1) defend the national security of the United States against the continuing threat posed by Iraq; and (2) enforce all relevant United Nations Security Council resolutions regarding Iraq[,]" Authorization for Use of Military Force Against Iraq Resolution of 2002, Pub. L. 107-243,

-4-

§ 3(a), 116 Stat. 1498 (Oct. 16, 2002) ("AUMF Iraq"), is "the equivalent of a congressional declaration of a state of war for purposes of [§ 1481(a)(6)]." USCIS Letter at 2. At this juncture in the proceedings, the parties agree that the case represents a challenge to the Director's response as "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" 5 U.S.C. § 706(2)(A) (2006); *see* Defs.' Cross-Mot. for Summ. J. at 7; Pl.'s Second Mem. in Opp'n to Defs.' [Cross-]Mot. for Summ. J. at 6.

DISCUSSION

The Administrative Procedure Act ("APA") permits judicial review of final agency action for which there is no other adequate remedy in a court. 5 U.S.C. § 704 (2006). An agency action is final if "the agency has completed its decisionmaking process, and . . . the result of that process is one that will directly affect the parties." *Franklin v. Massachusetts,* 505 U.S. 788, 797 (1992). The parties do not address whether the January 27, 2009 letter from the Acting Associate Director represents the agency's final action. The letter will be treated as final for purposes of this review, as the defendants have given no indication that Kaufman could have appealed the denial to a superior administrative authority. The APA directs that a "reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "[W]hen a party seeks review of agency action under the APA . . . [t]he 'entire case' on review is a question of law" and may be resolved on a motion for summary judgment under Rule 56. *Am. Bioscience, Inc. v. Thompson,* 269 F.3d 1077, 1083 (D.C. Cir. 2001). A district court reviewing an agency action under the APA's arbitrary and capricious standard acts as an appellate court resolving a legal question. *James Madison Ltd. by Hecht v. Ludwig,* 82 F.3d 1085, 1096 (D.C. Cir. 1996) (rejecting appellant's contention that there were fact issues

precluding summary judgment, and holding that review of agency action under the arbitrary and capricious standard presents only a legal question).

When a court reviews an agency's application of a statute it administers, "[f]irst, always, is the question whether Congress has directly spoken to the precise question at issue." *Chevron U.S.A. Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 842 (1984).  If "the intent of Congress is clear," then "that is the end of the matter." *Id.*  When a term is not specially defined, "deference to the supremacy of the Legislature, as well as recognition that Congressmen typically vote on the language of a bill, generally requires [a court] to assume that 'the legislative purpose is expressed by the ordinary meaning of the words used.'" *United States v. Locke,* 471 U.S. 84, 95 (1985) (quoting *Richards v. United States,* 369 U.S. 1, 9 (1962)).  Indeed, "[i]t is well-established that 'when the statute's language is plain, the sole function of the courts — at least where the disposition required by the text is not absurd — is to enforce it according to its terms.'" *Lamie v. U.S. Trustee,* 540 U.S. 526, 534 (2004) (quoting *Hartford Underwriters Ins. Co. v. Union Planters Bank, N. A.,* 530 U.S. 1, 6 (2000), in turn quoting *United States v. Ron Pair Enterprises, Inc.,* 489 U.S. 235, 241 (1989), in turn quoting *Caminetti v. United States,* 242 U.S. 470, 485 (1917)).  Further, the "fact that Congress may not have foreseen all of the consequences of a statutory enactment is not a sufficient reason for refusing to give effect to its plain meaning." *Union Bank v. Wolas,* 502 U.S. 151, 158 (1991) (quoted in *PDK Labs. Inc. v. U.S. Drug Enforcement Admin.,* 362 F.3d 786, 796 (D.C. Cir. 2004)).  In short, a court must "determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case." *Robinson v. Shell Oil Co.,* 519 U.S. 337, 340 (1997).

Congress did not specially define the term "state of war" for purposes of § 1481(a)(6). Therefore, in deciding "whether Congress has directly spoken to the precise question at issue,"

-6-

*Chevron,* 467 U.S. at 842, the statutory term must be accorded its plain meaning if it can be. *Robinson,* 519 U.S. at 340; *Locke,* 471 U.S. at 95. Specifically, the precise question here is whether the United States was in a state of war in 2004 or 2008 when Kaufman made his renunciation requests. There can be no genuine debate about that. The term "state of war" in § 1481(a)(6) is sufficiently unambiguous and plain in its meaning to describe the circumstances attendant to the United States when Kaufman made his initial renunciation request in July 2004, and when he renewed it in September 2008. Indeed, several courts have recognized that the United States was in a state of war at those times. Most notably, in 2004 the Supreme Court, referring to the circumstances prevailing at the time, stated that "[w]e have long since made clear that a state of war is not a blank check for the President when it comes to the rights of the Nation's citizens." *Hamdi v. Rumsfeld,* 542 U.S. 507, 536 (2004). In 2005, a judge of this court rejected a litigant's contention that the United States was not at war, concluding that "[t]he United States Congress, by its authorization statutes, has initiated war in the same way it has initiated war since World War II. . . . [T]he facts suggest that the United States is at war at the behest of Congress." *Qualls v. Rumsfeld,* 357 F. Supp. 2d 274, 284 (D.D.C. 2005).[2]

---

[2] *See also Hamdan v. Rumseld,* 548 U.S. 557, 628 (2006) ("The court [of appeals] accepted the Executive's assertions that Hamdan was captured in connection with the United States' war with al Qaeda and that that war is distinct from the war with the Taliban in Afghanistan. It further reasoned that the war with al Qaeda evades the reach of the Geneva Conventions. . . . We . . . disagree with the latter conclusion."); *Rumsfeld v. Padilla,* 542 U.S. 426, 431 n.2 (2004) (noting that "the President determined that Padilla . . . is closely associated with al Qaeda, an international terrorist organization with which the United States is at war") (internal quotation marks and alterations omitted)*; Hamdi v. Rumsfeld,* 542 U.S. at 531 (acknowledging under present circumstances the need to "ensure that those who have in fact fought with the enemy during a war do not return to battle against the United States"); *id.* at 541 (Souter and Ginsburg, JJ., concurring in part, dissenting in part, and concurring in judgment) (noting that the government characterized Hamdi's confinement as a "military wartime" detention); *Al-Bihani v. Obama,* 590 F.3d 866, 871 (D.C. Cir. 2010) (referring to and discussing the President's war power granted by Congress' authorization statutes); *In re Iraq and*

-7-

The defendants have erred as a matter of law in concluding that the statutory term is ambiguous as applied to the particular controversy at hand. Defendants posit that because "Congress did not explicitly define the term 'state of war' . . . . Congress has not directly spoken to the precise question at issue here," and that therefore the term is "ambiguous," making it subject to agency interpretation. Defs.' Cross-Mot. at 9. Defendants' conclusion is contrary to both law and common sense. Accepting defendants' conclusion would require that every term in every statute be specially defined or else be deemed ambiguous. That is not the law. Rather, the well-settled law — a cardinal rule that honors the separation of powers in our tripartite system of government — requires that the language of a statute be enforced according to its plain meaning if it can be. *Locke,* 471 U.S. at 95. Because the term "state of war" in § 1481(a)(6) "has a plain and unambiguous meaning with regard to the particular dispute in [this] case," *Robinson,* 519 U.S. at 340, the Director must apply the term without applying to it an adverb and an adjective that do not appear in the text of the statute.[3] *Lamie,* 540 U.S. at 534; *Locke,* 471 U.S. at 95.

---

*Afghanistan Detainees Litig.,* 479 F. Supp. 2d 85, 94 n.7 (2007) ("There appears to be no dispute that, presumably in accordance with both [congressional] authorizations, the United States has been enmeshed in ongoing wars in both Afghanistan and Iraq, and was engaged in active hostilities in both countries at the relevant times the plaintiffs allege they were detained and tortured.").

[3] Even if the term were ambiguous and required interpretation, the Director's construction suffers from serious infirmities. First, the construction does not enjoy the force of logic. The defendants' conclusion — that the term "state of war" means "congressionally declared state of war" — is not compelled by the premise that the drafters were in the midst of a war that involved congressional declarations of war. *See* Defs.' Cross-Mot. at 9 (referring to the "historical context" of the term). The opposite conclusion — that the drafters intentionally and purposefully omitted the modifier "congressionally declared" — is equally, if not more, compelled by the premise. There is no basis for concluding that the drafters were unaware of wars that did not involve formal congressional declarations. *See The Amy Warwick,* 67 U.S. 635, 668 (1862) ("If a war be made by invasion of a foreign nation, the President is not only authorized but bound to resist force by force. He does not initiate the war, but is bound to accept the challenge without waiting for any special legislative authority. And whether the hostile party

-8-

CONCLUSION

Because the Director of USCIS erred as a matter of law in not applying the plain terms of the statute to the request Kaufman submitted, his response constitutes an abuse of discretion or is otherwise not in accordance with law, in violation of 5 U.S.C. § 706(2)(A).  Therefore, the defendants' motion for summary judgment will be denied.  As there is no dispute that the Director of USCIS has the responsibility to administer § 1481(a)(6), Kaufman's request will be remanded to the Director for action consistent with this memorandum opinion.  Kaufman's motion for summary judgment will be granted to the extent it seeks a declaratory judgment that

---

be a foreign invader, or States organized in rebellion, it is none the less a war, although the declaration of it be '*unilateral*.' . . . It is not the less a war on that account, for war may exist without a declaration on either side.") (emphasis in the original; internal quotation marks and citation omitted); Curtis A. Bradley & Jack J. Goldsmith, *Congressional Authorization and the War on Terrorism,* 118 Harv. L. Rev. 2047, 2059-60 (2005) ("Starting with early conflicts against Indian tribes and the Quasi-War with France at the end of the 1700s, the United States has been involved in hundreds of military conflicts that have not involved declarations of war."); Grimmett, *Instances of Use of United States Armed Forces Abroad, 1798-2006* (listing numerous undeclared armed conflicts prior to World War II).
    Second, even if the defendants could make the case that the disputed term in § 1481(a)(6) really means "congressionally declared state of war," it is far from clear that the United States was not in such a state of war in either 2004 or 2008.  *See Qualls v. Rumsfeld,* 357 F. Supp.2d 274, 284 (D.D.C. 2005) ("The United States Congress, by its authorization statutes, has initiated war in the same way it has initiated war since World War II.  [The] argument that Congress has not declared war is made without legal argument or factual basis; the facts suggest that the United States is at war at the behest of Congress.").  *See also* Bradley & Goldsmith, 118 Harv. L. Rev. at 2065-66 ("With respect to this issue, we believe that the pattern of congressional action in declared wars provides additional support for the modern consensus that force authorizations can confer full congressional authorization for the President to prosecute a war.  This pattern shows that it is misleading, and probably wrong, to compare the authority conferred by war declarations in declared wars with the authority conferred by authorizations to use force in authorized but undeclared wars, much less to view a war declaration as a more extensive form of congressional approval than a force authorization.").

-9-

the Director's response was in violation of the APA, and denied in all other respects.[4]  All other pending motions will be denied as moot.

      A separate order accompanies this memorandum opinion.

      SIGNED this 24th day of February 2010.

                                        /s/
                                  RICHARD W. ROBERTS
                                  United States District Judge

---

[4] To the extent that Kaufman seeks an order of mandamus, his request is denied.  Any claim for mandamus relief, which is available only in the case of non-discretionary functions owed a plaintiff, is moot in light of the accompanying order.  *See Heckler v. Ringer*, 466 U.S. 602, 616 (1984) ("The common law writ of mandamus, as codified in 28 U.S.C. § 1361, is intended to provide a remedy for a plaintiff only if he has exhausted all other avenues of relief and only if the defendant owes him a clear nondiscretionary duty.").